# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHAD LAWLER,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LAIDLAW CARRIERS FLATBED GP,** | : | **CIVIL ACTION** |
| **INC.  ET AL.,** | : | |
| **Defendants.** | : | **NO.  10-1103** |
| | : | |
| | : | |
| | : | |

## MEMORANDUM

TUCKER, J.                                                                    June___, 2012

      Presently before the Court is Defendants' Motion for New Trial and Motion for Remittitur (Docs. 60, 67), Plaintiff's Response thereto (Docs. 61, 68), and all accompanying briefs and relevant correspondence.  For the reasons set forth below, Defendants' Motion is **DENIED**.

## BACKGROUND

      Plaintiff, Chad Lawler ("Lawler"), a Pennsylvania resident and former laborer for Dedicated Management Group, brought this personal injury action against: (1) Defendant Contrans Income Fund d/b/a Laidlaw Carriers Flatbed GP, Inc., a Canadian corporation ("Laidlaw"); (2) Bogdan Mulak, a Canadian citizen (collectively, "Defendants"); and (3) Patricia Bottomley.[1]  Plaintiff alleged that he sustained bodily injury caused by a motor vehicle accident for which Defendants were responsible.

---

[1] Defendant Patricia Bottomley was terminated from this action.

On March 19, 2008, Plaintiff Lawler, age 19, was involved in a three car automobile collision while he was on duty as an employee of Dedicated Management Group.  On that day, Plaintiff was riding as a passenger in a 2004 International Harvester Tractor traveling northbound on Interstate 95 in Chester Township.  When the driver of the tractor transporting the Plaintiff slowed down due to traffic conditions, a white 2000 Volvo semi-trailer directly behind the tractor failed to stop in time and collided with the tractor.  The Defendant driver of the Volvo semi-trailer, Bogdan Mulak, was working as an agent within the scope of his employment for Defendant Laidlaw at the time of the collision.

Immediately after the tractor in which Plaintiff was riding was hit by the Volvo semi-trailer, the Dodge Caravan directly behind the Volvo semi-trailer, driven by Defendant Patricia Bottomley, rear-ended the semi-trailer, which in turn caused the semi-trailer to rear-end the tractor a second time.

Plaintiff claimed that as a result of the collisions, both caused by the Defendants' negligence, Plaintiff suffered great loss, pain and suffering, which prevented him from continuing to work as a laborer at a rate of $450.00 per week.  Plaintiff also claimed that his activities of daily living were restricted, and that he has incurred, and would incur in the future, increased medical bills due to health complications as a result of the collision.  Due to his injuries, Plaintiff's neurosurgeon recommended, and Plaintiff underwent, a surgical cervical discectomy and fusion.

Plaintiff sought relief in the form of damages in excess of $150,000.00, separately from Defendants and from Bottomley.  This requested amount included, but was not limited to lost earnings and earning power, actual damages, as well as damages for pain and suffering.

2

Plaintiff's claims were based on the theory of negligence.

Two weeks prior to trial, in their Pretrial Memorandum, Defendants admitted liability for the negligence of driver, Defendant Mulak, and conceded that there was no contributory negligence on the part of Plaintiff Lawler. (Doc. 27). A few days prior to trial, on July 25, 2011, Plaintiff submitted a case summary announcing that punitive damages were being sought (Doc. 34). Additionally, on July 28, 2011, Plaintiff filed proposed jury charges, which included proposed instructions on punitive damages. (Doc. 39). Plaintiff's Complaint failed to include a claim for punitive damages.

Starting August 1, 2011, a four day jury trial was held before this Court. On August 5, 2011, the jury returned a verdict in favor of Plaintiff, awarding a total amount of $2,761,791.00 in damages. On August 15, 2011, Defendants moved for a New Trial or Remittitur, and subsequently filed their supporting Memorandum of Law on November 15, 2011. (Doc. 67).

**LEGAL STANDARDS**

A court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Generally, a court will order a new trial: (1) when the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) when improper conduct by an attorney or the court unfairly influenced the verdict; (3) when the jury verdict was facially inconsistent; or (4) where a verdict is so grossly excessive or inadequate "as to shock the conscience." Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002) (citations omitted). Determining whether to grant a new trial is within the sound discretion of the trial court. Wagner v. Fair Acres Geriatric Ctr, 49 F.3d 1002, 1017 (3d Cir. 1995).

When determining whether to order a new trial after a jury trial, the court should only do so if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the verdict were to stand." Williamson v. Conrail, 926 F.2d 1344, 1352 (3d Cir. 1991). The granting or refusal of a new trial because of excessiveness is within the discretion of this Court. Robert v. Chodoff, 393 A.2d 853, 871 (Pa. Super. Ct. 1978). In general, courts will sustain jury verdicts if, drawing all reasonable inferences in favor of the prevailing party, there is a reasonable basis to uphold the verdict; courts will examine the record for evidence that could reasonably have led to the jury's verdict. See Nissim v. McNeil Consumer Products Co., 957 F. Supp. 600, 602-04 (E.D. Pa. 1997).

"Remittitur is justified only in limited instances...where the verdict plainly is excessive, exorbitant, and beyond what the evidence warrants, or where the verdict resulted from partiality, prejudice, mistake, or corruption." Smalls v. Pittsburgh-Corning Corp., 834 A.2d 410, 414 (Pa. Super. 2004) (citations omitted). The proper question for this Court to resolve is whether the award of damages fall within the excessive, unsupportable realm of unreasonable compensation, or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake or corruption.

Pennsylvania's Superior Court has stated six factors that are to be considered in determining whether a verdict is excessive or exorbitant in light of the evidence at trial: (1) the severity of the injury; (2) whether the injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony; (3) whether the injury is permanent; (4) whether the plaintiff can continue with his or her employment; (5) the size of the out-of-pocket expenses; and (6) the amount of compensation demanded in the original complaint.

4

 Bey v. Sacks, 789 A.2d 232, 242 (Pa. Super. Ct. 2001) (citing Harding v. Consolidated Rail

Corp., 620 A.2d 1185, 1193 (Pa. Super. Ct. 1993)).  The Superior Court also stated that "because

every case is unique, the trial court should apply only those factors which are relevant to the

particular case in question before determining if the verdict is excessive." Id. (citing Mineo v.

Tancini, 502 A.2d 1300, 1305 (Pa. Super. Ct. 1986)).

## DISCUSSION

Defendants move for a new trial, or in the alternative, remittitur.  Defendants claim that

the jury verdict in this matter, awarding Plaintiff a total of $2,761,791.00 in damages, including

$1,500,000.00 million for Plaintiff's loss of earning potential, was both contrary to the evidence

proffered at trial, and a shock to the conscience concerning justice.  Further, Defendant asserts

that the jury verdict was unfairly influenced due to the Court's error in: (1) denying Defendant's

Motion in Limine to preclude Plaintiff's request for punitive damages, or alternatively, failing to

sever or hold in abeyance Plaintiff's claim for punitive damages; (2) permitting the introduction

into evidence of the Laidlaw Safety Report; and (3) failing to grant defense counsel's request for

a mistrial after Plaintiff's counsel, during its closing statement, suggested a general amount of

recovery to the jury.

Moreover, Defendant Laidlaw contends that remittitur will not cure the prejudice to

Defendants caused by Plaintiff's improper and unsupported arguments of Defendants' willful,

reckless conduct.  However, in the absence of a Court finding that a new trial is appropriate,

Defendants request alternatively that this Court recommend remittitur due to the excessiveness of

the damages awarded for lost earnings, and the apparent prejudice which swayed the jury and

resulted in such an excessive award.  Lastly, Defendants request that if the Court should decline

to recommend remittitur, that the Court issue a new proceeding on the issues of damages for future lost earnings.

**A.      Motion for New Trial**

In support of its motion for new trial, Defendants note that the Supreme Court has strongly intimated that common law and statutory procedures surrounding punitive damages claims, particularly in civil cases, are somewhat imprecise in being administered.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003).  With that, Defendants submit arguments on three of the four prongs of the standard under which this Court may evaluate a motion for a new trial: (1) the clear weight of the evidence failed to support the jury verdict, requiring a new trial in the interest of justice; (2) the Court erred during trial, which unfairly influenced the verdict; and (3) the award of the verdict was grossly excessive, rising to the level that would "shock the conscience".  The Court addresses each of these arguments in turn.

**1.      Clear Weight of Evidence was Sufficient to Support Jury Verdict on Potential Lost Earnings**

First, Defendants submit that the $1.5 million awarded to the Plaintiff on loss of earning potential was against the weight of evidence proffered at trial, which warrants a new trial.  More specifically, Defendants aver that: (1) Plaintiff's trial testimony shows that the lost earnings amount handed down by the jury was unsupported, and (2) the findings of Plaintiff's vocational expert lacked proper foundation, and were too speculative.

Defendants contend that Plaintiff admitted during his trial testimony that he experienced a good recovery from the injuries caused by the accident.  (Tr. 40:12-14, August 2, 2011).  Further, Plaintiff testified that post-surgery, the arm in which he previously felt pain was healed, and the

6

problems he had with two of his fingers went away.  (Tr. 49:20-24, August 2, 2011).

Additionally, Plaintiff testified that despite the fact that his neck pain returned post-surgery, the

pain was not nearly as severe as it was prior to the surgery, and at that time. required daily Advil

for relief.  Moreover, the Plaintiff stated that he rarely had an occasion to use the Percocet

prescribed to him for pain management.  (Tr. 50:2-14, August 2, 2011).

     Defendants submit that Plaintiff also offered testimony about his physical capability after

the accident, stating that he was able to lift and bend, with some pain that was localized to his

neck area.  (Tr. 52:21-25; 53:3 - 54:3, August 2, 2011).  Plaintiff admitted that despite feeling

that he would be unable to resume his employment duties as a driver's helper due to his pain

from the accident, he had attempted to lift heavy items subsequent to his post-accident surgery.

(Tr. 53:16-25; 54:6-9, August 2, 2011).  Plaintiff described his future career plans to become a

Licensed Practitioner Nurse ("LPN"), continue with his studies to become a Registered Nurse

("RN"), and obtain a Bachelor of Science in Nursing from Wilmington College.  Plaintiff

testified that he believed he would be able to perform the physical tasks required of an LPN.  (Tr.

58:13-21; 72:1-11, August 2, 2011).   Also, Plaintiff testified that he has participated in

household chores since the accident, and has returned to activities that he previously enjoyed,

including but not limited to light fishing and hunting with a shotgun.  (Tr. 90:18 - 91:16, August

2, 2011).

     Plaintiff properly counters that Plaintiff's trial testimony submitted by Defendants must

be viewed not in parcels, as offered by Defendants, but must be taken together with the admitted

medical evidence, medical and vocational expert opinions.  Combined, the aforementioned

evidence reasonably supports the jury award for loss of earning potential.

At the time of the accident, Plaintiff was a mere 19 years old, and was employed in his first job out of high school.  (Tr. 14:25 - 15:9, August 2, 2011).  Plaintiff testified that his original career plan was not to remain a delivery person, but to join the coast guard and become a state trooper, professional aspirations which Plaintiff can obviously not realize due to the nature of the injuries sustained from the accident.  Plaintiff also testified that due to his injuries, he altered his career goals and was studying to become a nurse at the time of trial.  (Tr. 54:13 - 55:5; 58:3-21, August 2, 2011). Significantly, the extent of Plaintiff's future pain and suffering is unknown, as testified to by Plaintiff, submitted by Plaintiff's medical expert, and testified to by Plaintiff's vocational expert, Mr. Daniel Rapucci.

Plaintiff underwent a fusion, or cervical discectomy, in the neck.  As Mr. Rapucci testified, this surgical procedure, the success of which is uncertain, can cause residual problems for the injured party, including but not limited to limited range of motion, headaches, pain and discomfort. (Tr. 12:8 - 13:3, August 3, 2011).  Moreover, Mr. Rapucci testified that Plaintiff's possible loss of future earnings would be determined by Plaintiff's lost opportunity to achieve a nurse's salary, unknown future events concerning Plaintiff's health, and Plaintiff's abbreviated life expectancy.  (Tr. 32:4 - 38:22, August 3, 2011). As a result of these several variables, Mr. Rapucci estimated that Plaintiff's future lost earnings would fall within a large range, from $343,208 to $2,002,528. (Tr. 32:4 - 33:18, August 3, 2011).

Lastly, as Plaintiffs point out, defense counsel opted not to challenge Plaintiff's vocational expert with their own vocational expert.  Upon defense counsel's cross examination of Mr. Rapucci, no evidence was brought to light that would make the jury's verdict unreasonable.  Accordingly, the Court finds that the jury award of $1.5 million was well within

the range proffered by Mr. Rapucci, and was supported by reasonable evidence.

Additionally, Defendants contend that the speculative testimony of Plaintiff's vocational expert, Daniel Rapucci, fails to support the jury verdict of $1.5 million in compensatory damages. Pointedly, Defendants aver that Mr. Rapucci's finding that at some point in the future, Plaintiff would be unable to perform his duties as an LPN, was unsupported by medical evidence, and was thus mere opinion. Moreover, Defendants submit that Mr. Rapucci failed to give specifics concerning when Plaintiff would be unable to perform the tasks of an LPN. In addition, Defendants claim that Mr. Rapucci's theory that Plaintiff might suffer even greater loss if he attained the position of an RN was unsubstantiated, and nonsensical based on the fact that Mr. Rapucci also found that the LPN position, which is required to become an RN, requires more physically demanding work.

The Third Circuit has pronounced that in the context of projected future earnings loss, "[an] expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to the jury." Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983). In Gumbs, admission of expert testimony based on speculative assumptions was viewed by the Third Circuit as an abuse of discretion by the district court, where the plaintiff's expert witness testified that plaintiff's future income would be double his annual income earned prior to the accident in question, without showing any factual support for such an estimation.

Plaintiff accurately counters that on the record, there existed an abundance of evidence that supported Mr. Rapucci's findings, including: (1) Mr. Rapucci's interview with the Plaintiff, and assessment of the Plaintiff's ability to perform the work required of an LPN and RN; (2) Plaintiff's medical records; and (3) Dr. Greene's trial deposition testimony, which limited

Plaintiff's post-accident capabilities to "light to medium" work-wise.  Plaintiff aptly points out

that Defendants' Motion for a New Trial sets forth the exact same arguments rejected by this

Court at trial concerning Mr. Rapucci's testimony regarding earning potential being too

speculative.  At trial, this Court clearly ruled that "[a]s it relates to Mr. Rapucci, I am not going

to strike his testimony.  I don't think it is speculative."  (Tr. 118:8-10, August 3, 2011.)  There

has been no new evidence submitted by Defendant on this issue.  Thus, this Court maintains its

position that Mr. Rapucci's testimony was appropriate, relevant, and based on sufficient factual

foundation.

Further, Plaintiff accurately submits a case more analogous to the present matter, due to

the young age of Plaintiff at the time of the accident.[2]  Schultz by Schultz v. Devaux, 715 A.2d

479 (Pa. Super. 1998) involved a minor who suffered the total loss of hearing in one ear and

facial nerve damage as the result of a fall from the deck of a duplex being rented by his mother.

In response to the defendant's argument that the amount awarded for potential lost earnings was

purely speculative, the Superior Court of Pennsylvania recognized that there is a level of

uncertainty associated with such calculations where the plaintiff is a minor, stating that "[t]he test

_____

[2] Defendants cite as persuasive authority Nielsen v. Northbank Towing, 768 So. 2d 145, 163 (La. App. 1
Cir., July 13, 2000) as being applicable to support their proposition that Mr. Rapucci erred in using Plaintiff's future
nursing earnings to calculate greater future wage loss instead of using such earnings to offset future lost wages.  The
Court disagrees.  In Nielsen, the injured plaintiff, who was a diver at the time of the accident that caused his injury,
decided to pursue a career in nursing instead of pursuing a career as a diver.  Notably, unlike Plaintiff Lawler, the
Nielsen plaintiff suffered no residual physical injuries that would prevent him from fully achieving his nursing career
goals.  Concerning the present matter, Defendants argue that as in Nielsen, Plaintiff's nursing studies and nursing
career should be used to offset future wage loss instead of increase it, as plaintiffs generally have a duty to mitigate
future wage loss.  However, Nielsen is distinguishable from this case, where the medical records and seriousness of
Plaintiff Lawler's injuries and surgery showed that Plaintiff will likely suffer future pain, in uncertain amounts, for
the rest of his life as a result of the neck and back injuries he sustained due to Defendants' negligence.  This future
pain over the several remaining years of Plaintiff Lawler's life is reasonable support for Mr. Rapucci's theory that at
some point in the future, Plaintiff will likely be prevented from working for a period of time due to poor health
conditions and pain that he would not have experienced but for the car accident.  For these reasons, the Court
declines to apply Nielsen.

for impaired earning capacity is whether the economic horizon of the disabled person has been shortened because of the injuries sustained as a result of the tortfeasor's negligence." Id. at 482 (citing Harding v. Consolidated Rail Corp., 620 A.2d 1185, 1194 (Pa. Super. 1993)).

Not only did Mr. Rapucci appropriately opine on the potential shortening of Plaintiff's economic horizon due to injuries that he sustained in the crash, but Mr. Rapucci also permissibly based his estimates on the likelihood, as reflected in Plaintiff's vocational test results, that the Plaintiff would complete his present course work to become a Licensed Nurse Practitioner ("LPN"), allowing him a higher salary in years to come than that of Plaintiff's laborer salary when he was injured.  Similar to the young Plaintiff in Schultz, Plaintiff, who was nineteen years old at the time of the accident, should not be expected to have the same job, credentials, and earning capacity as he ages.  Plaintiff, at the time of trial and immediately beforehand, was completing course work aimed at becoming an LPN.  Thus, Mr. Rapucci's testimony was supported by sufficient factual foundation.

**2.      The Court did not Err at Trial, and thus the Jury was not Unfairly Prejudiced**

Defendants contend that the Court erred at trial in the following respects: (1) delaying its disposition on Defendants' motion to preclude Plaintiff's request for punitive damages, or failing to in the alternative, severe or hold in abeyance Plaintiff's punitive damages request; (2) permitting the introduction of the internal Laidlaw Safety Report, created by an investigator for Defendant Laidlaw at the scene of the accident; and (3) failing to grant Defendant's request for a mistrial after Plaintiff's counsel mentioned, in his closing argument, a potentially appropriate amount of recovery to award.  The Court disagrees, and finds that it did not commit these errors, and that the evidence and statements submitted at trial were not unduly prejudicial.  Thus, there

was no unfair prejudice of the jury, and the Court will not grant a new trial on these bases. Because the purported errors are intertwined, the Court will discuss them in proper context below.

First, Defendants maintain that the Court erred when it declined to rule on the defense's objection to Plaintiff's submission of evidence on punitive damages, with such objection being advanced by defense counsel prior to trial.  The Plaintiff's request for damages was submitted six days prior to trial, and Defendants argued against the request immediately after the completion of jury selection, and again after the close of Plaintiff's case.  On day three of the four day trial, the Court ultimately ruled in Defendants' favor, and forbid the submission of punitive damages as an issue for the jury to consider, along with striking certain language from the internal Laidlaw Safety Report involving opinions of the investigator that might prejudice the jury concerning punitive damages.  (Tr. 118:17 - 23, August 3, 2011).  Additionally, the Court read the following limiting jury instructions:

> "As I have stated, the Defendants have stipulated to liability. This means that the Plaintiff is entitled to recover from the Defendants for all of the damages caused by the accident.  The Defendants have admitted negligence in causing the accident in question.  Thus, you are required to determine, first, what injury the Plaintiff sustained that was caused by the accident, and second, the amount of damages to which Plaintiff is entitled as *compensation* for such injuries **....**
>
> The Plaintiff must prove to you that the Defendants caused the Plaintiff's damages.  This is referred to as factual cause.  The question is, was the Defendants' negligent conduct a factual cause in bringing about the Plaintiff's damages.
>
> Conduct is a factual cause of harm when the harm would not have occurred absent the conduct.  An act is a factual cause of an outcome if in the absence of the act the outcome would not have occurred.  To be a contributing factor, the Defendants' conduct need not be the only factor.  The fact that some other cause concurs with the negligence of the Defendants in producing an injury does not

12

relieve the Defendants from liability, as long as their own negligence is a factual cause of the injury.

Members of the jury, you must find an amount of money damages that you believe will fairly and adequately *compensate* the Plaintiff for physical injuries you find he sustained as a result of the accident.  The amount which you award today must *compensate* Plaintiff completely for the damages sustained in the past as well as the damages he will sustain in the future.  This is known as *compensatory damages.  Punitive damages are not in this case and should not be considered by you.*

(Tr. 117:19 - 119:10, August 4, 2011) (<u>emphases</u> <u>added</u>).

Further, Defendants argue that this error by the Court was so damaging and prejudicial that any limiting jury instruction on the matter of punitive damages, including the limiting instructions given by the Court in this trial, could not serve to cure the prejudice to Defendants. Defendants aver that the prejudicial damage caused by the Court's delay included the following: (1) allowing Plaintiff's counsel to pepper his opening statement with phrases purportedly related to punitive damages, including the alleged recklessness of Defendants' behavior; (2) allowing evidence of the spaghetti on the windshield to be submitted, both during Plaintiff's counsel's opening statement, and in the Laidlaw Safety Report, to support a finding that Defendants should be punished; and (3) by allowing Plaintiff's counsel to make unfounded arguments concerning Mr. Mulak's motives while he drove the vehicle that caused the accident.

Plaintiff counters, stating that: (1) the Court properly admitted evidence that Defendant Mulak was eating spaghetti at the time of the collision; (2) Defendants ultimately won their motion to preclude the punitive damages claim, as well as certain related evidence; and (3) even if the Court's admission of the evidence of spaghetti on the windshield of Defendant Laidlaw's vehicle was error, such error was harmless, as the jury verdict for past and future pain and

13

suffering were below normal standards.

The Court finds that no error was committed in the mere two day delay of the Court in deciding on Defendants' motion to preclude Plaintiff's request for punitive damages. Moreover, the Court notes that contrary to Defendants' characterization, the Court ultimately granted Defendants' request to preclude punitive damages from being considered, and struck portions of evidence that the Court found should not be reviewed by the jury as a result of the punitive damages claim that was disallowed.

It is well settled law that a court may grant a new trial under FED. R. CIV. P. 59(a)(1)(A). when improper conduct by an attorney or the court unfairly influenced the verdict. Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002) (citations omitted). It is, however, within the sole discretion of the court to determining whether such relief is appropriate. Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).

The Court does not find that counsel for Plaintiff engaged in conduct, or made statements, that rise to a level requiring a new trial. In Plaintiff's opening, made prior to the Court's disposition on whether punitive damages would be permitted, the Plaintiff made the following statements at issue:

> "Mr. Mulak was traveling too fast for conditions. Mr. Mulak was tailgating. The police fined him for tailgating. And what else Mr. Mulak was doing, the evidence will show and we will prove, was reckless. When you are driving a 70,000-pound tractor trailer on I-95 in the rain too fast for conditions and tailgating, you should not be eating spaghetti. But that's what Mr. Mulak was doing, the evidence will show.
>
> ....
>
> So we submit to you, we will prove, the evidence will show that

14

> willfully reckless conduct, not mere negligence, was the cause of
> this accident."

(Tr. 47:3 - 23, August 1, 2011).

Contrary to Defendants' arguments, the Court finds that although Plaintiff's counsel used language concerning the alleged reckless conduct of Defendants, and referred to Defendant Mulak eating spaghetti while driving, these statements were not prejudicial because: (1) the Court provided a limiting jury instruction, directing the jury that punitive damages were not at issue, and explaining the necessary evidence to consider for compensatory damages, the only issue for the jury to consider, and (2) the references made by Plaintiff's counsel's in referring to the spaghetti, particularly in Plaintiff's closing statements, were permissibly offered to show the severity of the impact that Plaintiff sustained in the collision, a factor relevant to compensatory damages, as memorialized during the proceedings.  (Tr. 20:12 - 24, August 4, 2011).

The Court notes that its limiting jury instruction was not only sufficient, but was precisely the instruction requested by defense counsel at trial, in opposition to Plaintiff's request for a more detailed instruction on the Court's rationale for excluding punitive damages from the case. Defense counsel expressly stated, in the context of his concern about potential prejudice of the jury if they were to hear any further evidence or statements about wilful misconduct, that "[t]his instruction should be that punitive damages are not in this case.  That's what the instruction should be.  Not why your Honor decided it, but that it's not an item of damages for them and in conjunction with your charge, sympathy and bias is not a part of this case either."  (Tr. 21: 8 -14, August 4, 2011).  This was precisely the instruction given by the Court.

15

The Court also did not err in its treatment of the Laidlaw Safety Report.  It is a well established principle that the admission or exclusion of evidence at trial is left within the sole discretion of the trial court.   The trial court's authority to determine the admissibility of evidence may only be reversed if the moving party shows a manifest abuse of such discretion.  Johnson v. Hyundai Motor America, 698 A.2d 631, 636 (Pa. Super. 1997), appeal denied, 712 A.2d 286 (1998) (citing Berman v. Radnor Rolls, Inc., 374 Pa. Super. 118, 126, 542 A.2d 525, 538 (1988)).

The Court, after careful consideration, determined that the items that may have unduly prejudiced the jury, namely certain portions of the Laidlaw Safety Report, would be redacted and not provided to the jury if requested during deliberations.  Thus, the Court, in its proper authority, determined that the conduct of Plaintiff's counsel did not unduly influence the jury, and struck the evidence that it deemed might cause undue influence on the jury.  Namely, the Court struck verbiage from the Laidlaw Safety Report referring to the spaghetti found on the inside of windshield of the tractor that struck the vehicle in which Plaintiff was a passenger. Pointedly, the Court honed in on and struck the specific language in the Laidlaw Report which reflected the investigator's finding that Mr. Mulak, the driver, was eating spaghetti at the time of the accident, and that his eating of spaghetti was the cause of the accident.  There is no evidence, proffered by Defendants or on the record, that the Court abused its discretion in making these determinations.[3]

---

[3] The Court declines to discuss arguments set forth in Defendants' Motion for New Trial concerning the inadmissibility of the Laidlaw Safety Report under hearsay rules and the critical self analysis doctrine.  The Court considered these arguments and related case law at trial when it determined that Plaintiff's punitive damages claim would not be submitted to the jury, and that portions of the Laidlaw Safety Report would be stricken from the record. (Tr. 91:12 - 113:, August 3, 2011).

Regarding the Court allowing statements by Plaintiff's counsel relating to spaghetti on the windshield, both in Plaintiff's opening and closing statements, the Court maintained the authority to allow or disallow such statements, so long as the Court's decision did not constitute an abuse of discretion, which it did not.  As Plaintiff's counsel specifically stated, he offered commentary on the spaghetti in order to prove the severity of the impact, which is a relevant factor for consideration by the jury concerning the issue of compensatory damages.  (Tr. 20:12 - 24, August 4, 2011).

Defendant also contends that the late notice of Plaintiff's request for punitive damages, along with arguments made at trial that Defendants should be punished for reckless behavior concerning the automobile accident, tainted the jury's compensatory damages verdict.  Defense counsel submits that his motions practice strategy, trial preparation and overall litigation approach would have differed vastly had Plaintiff's punitive damages request been made earlier, and that this severely handicapped Defendants.

The Court finds Defendants' arguments unpersuasive.  Here, the Court appropriately disallowed the punitive damages claim altogether due to Plaintiff's failure to make out such a claim in its Complaint, and the lateness of submission of such a claim.  (Tr. 118:11 - 16, August 3, 2011).  Additionally, the Court took active and curative measures to prevent the jury from unfair prejudice.  These measures included, as discussed above, redacting portions of the Laidlaw Report referencing spaghetti, in addition to giving the Defendants' agreed upon jury instruction.

Lastly, defense counsel maintained and availed itself properly of opportunities to emphasize to the jury that punitive damages were not to be considered, as ruled upon by the Court.  To this end, defense counsel Mr. Jenkins stated the following:

17

> "Now at the outset, at the very beginning of this case in an opening speech, Mr. Badey started talking to you about punitive damages, reckless conduct, put in evidence about spaghetti.  A whole document from a safety report.  It's like it's pushing you to be biased at the very beginning about Mr. Mulak's conduct.  And you know what, that's not in the case.  I objected, Judge Tucker agreed with my objection at the close of Plaintiff's case, that [it] is not in the case and you are going to receive an instruction on that.  So you decide this case on the basis of damages, not on punitive[s].  You do not punish anybody in this case.  Instead, you decide this case on the basis of the evidence that is put in front of you."

(Tr. 70:18 - 71:7).

Lastly, Defendants claim that the Court also erred in refusing to grant a mistrial during closing statements.  The issue submitted by Defendants is that Plaintiff's counsel improperly suggested an award amount in his closing statements to the jury.  The language used by Plaintiff's counsel, in the context of addressing Defendants' medical witness Dr. Krasnick, is as follows:

> "They know that most of you, maybe all of you, I hope, but at least most of you are not going to - you are you are going to look at Krasnick and you are going to laugh when you get back there, are they kidding?  And they are hoping that by handing Dr. Krasnick $13,000, which seems to be extraordinary and outrageous, to come in here and spew lies about what the truth is, about what really happened to [Plaintiff] Chad.  They are counting on the fact that maybe, just maybe one or two of you will latch on to some ambiguity that Dr. Krasnik talked about.  And then if they touch base with just one or two of you, when you get in there and you start talking about the damages that Chad is going to have for the next 57 years, spending $13,000 to save millions is a good bargain for them."

(Tr. 43:16 - 44:6, August 4, 2011).

Defendants' objection to the above statement was sustained by the Court (Tr. 44:7-9,

18

August 4, 2011).  Defendants now claim that the Court erred in refusing Defendants' request for a mistrial immediately after this statement was made.  At trial, Plaintiff introduced evidence that he was entitled to recovery of a $120,000 lien asserted by his employer's worker's compensation insurer.  However, Defendants note that all other damages, including future medical expenses, past and future pain and suffering, and future lost earnings, were unliquidated.  Specifically, Defendants point out that Dr. Greene's estimate of costs for future medical expenses was disputed by Defendants.  Additionally, Defendants offers its reading of Stassun v. Chapin, 188 A. 111 (Pa. 1936) to support their argument that the mere mention to the jury of a specific sum claimed by Plaintiff is prejudicial error because it plants a specific dollar amount in the minds of the jurors, where such an amount lacks evidentiary support.

        Plaintiff argues that at no point during trial, did Plaintiff's counsel suggest a specific dollar sum to the jury for any damages.  To the contrary, Plaintiff suggested only that special damages were well over $2.6 million, to which Defendants made no objection.  This statement was supported by the evidence admitted at trial through Mr. Rapucci's testimony.  Additionally, Plaintiff's counsel emphasizes that in his closing, he stated in no uncertain terms that concerning pain and suffering, he was not permitted to recommend a certain dollar amount.  (Tr. 58:8-17, August 4, 2011).  Moreover, Plaintiff submits that the cases offered by Defendants fail to support Defendants' proposition concerning the issue of a mistrial being appropriate under the circumstances in the present matter.

        The Court finds no error in its denial of Defendants' request for a mistrial.  In Stassun, the holding issued by the Pennsylvania Supreme Court provides guidance, which is contrary to Defendants' reading.  The court in Stassun affirmed judgment in favor of Plaintiff.  First the court

set forth the following general rule:

> "Remarks by counsel which are aimed to have the jury substitute prejudice
> or passion for reason and intelligent analysis of the evidence, are wholly
> reprehensible, and call for immediate repudiation by the trial judge and in
> some instances for the more drastic remedy of the withdrawal of a juror. In
> cases where the damages are unliquidated and incapable of measurement
> by a mathematical standard, statements by plaintiffs' counsel as to the
> amount claimed or expected are not to be sanctioned, because they tend to
> instill in the minds of the jury impressions not founded upon the
> evidence."

The Stassun court determined that counsel's statement was not violative of the above rule,

stating that the "remark to the jury amounted to no more than a statement that a verdict of three or

four thousand dollars would be 'small' because it would include only the damages definitely

proved by plaintiff's evidence and not cover the other items of recovery to which under the law he

was entitled." Id. at 111-112. Here the Court properly sustained Defendants' objection, where

plaintiff's counsel generally stated "millions", but did not specify an exact dollar amount to be

considered by the jury. The Court appropriately denied Defendants' motion for mistrial, and

warned Plaintiff's counsel to be cautious concerning statements containing suggested dollar

amounts in his closing statement. (Tr. 45:20-21, August 4, 2011). This Court properly used its

discretion to prevent improper and prejudicial statements to the jury by sustaining the objection, in

similar fashion to the action take by the trial court in Stassun, where the judge instructed the jury

to disregard the statement of plaintiff's counsel during its closing statements. Id. at 112.

Accordingly, the Court declines to grant a new trial, as it finds that the Court did not err in

its actions during trial.

**3.      The Jury Award was not Grossly Excessive**

The Court finds that the jury award of  $2,761,791.00 in damages, which included $1.5

million for Plaintiff's future lost earnings, was not excessive.  The granting or refusal of a new

trial because of excessiveness is within the discretion of this Court.  Robert v. Chodoff, 393 A.2d

853, 871 (Pa. Super. Ct. 1978).  The following factors are relevant to the court's inquiry of

whether a jury award is excessive:

> "(1) the severity of the injury, (2) whether plaintiff's injury is
> manifested by objective physical evidence instead of merely the
> subjective testimony of the plaintiff, (3) whether the injury will
> affect the plaintiff permanently, (4) whether the plaintiff can
> continue with his employment, (5) the size of plaintiff's
> out-of-pocket expenses, and (6) the amount plaintiff demanded in
> the original complaint."

Id.

For the same reasons set forth below in the Court's discussion of Defendants' request for

remittitur, the Court finds that a new trial is unwarranted, as the jury award was not excessive.

**B.      Motion for Remittitur**

For the reasons set forth below, the Court also finds that remittitur is inappropriate. In

order to qualify for remittitur, which may be recommended to the parties in the sole discretion of

the trial court, the moving party must show that "the verdict is plainly excessive, exorbitant, and

beyond what the evidence warrants, or where the verdict resulted from partiality, prejudice,

mistake, or corruption." Smalls v. Pittsburgh-Corning Corp., 834 A.2d 410, 414 (Pa. Super. 2004)

(citations omitted).  The Pennsylvania Superior Court has stated that the same six factors to be

considered in determining whether a verdict is excessive or exorbitant when considering a motion

for a new trial are also to be used by courts evaluating a request for remittitur.  Bey v. Sacks, 789

A.2d 232, 242 (Pa. Super. Ct. 2001) (citing Harding v. Consolidated Rail Corp., 620 A.2d 1185,

1193 (Pa. Super. Ct. 1993)).

Defendants aver solely that the jury award was excessive, focusing their argument on the $1.5 million awarded for future lost earnings.  Defendants argue that the jury must have ignored the evidence that Plaintiff is fully capable to perform the duties of a licensed practical nurse, as supported by Plaintiff's own testimony, and Plaintiff's physician.  Instead, Defendants contend that the jury must have been swayed by sympathy for the Plaintiff or bias against Defendants, thus awarding an excessive amount of future lost earnings nearly two times greater than the total amount of wages Plaintiff could have earned as a driver's helper.

Plaintiff denies that the jury award was excessive, pointing out that the amount awarded for future lost earnings was $500,000 lower than the upper limit of the range suggested by Plaintiff's vocational expert, Mr. Rapucci.  Furthermore, Plaintiff avers that Defendants failed to avail themselves of the opportunity to produce a differing expert opinion at trial to attempt to convince the jury to award a lower amount.

The Court finds the first four factors concerning excessiveness are most relevant, and favor denial of a remittitur recommendation.  Those factors deal with the severity and permanence of Plaintiff's injury, as well as his ability to continue employment.  Here, Plaintiff Lawler suffered an extreme injury requiring a discectomy.  This procedure relieved some of his pain, but Plaintiff's medical expert set forth objective evidence supporting the likelihood that Plaintiff will suffer with pain for the rest of his life due to the back and neck injuries sustained in the collision, making it clear that Plaintiff's injuries are of a permanent nature.  Additionally, there exists objective evidence from Plaintiff's physician that he will be unable to continue the type of employment in which he was engaged at the time of the accident, namely that of a laborer

performing heavy lifting.  Thus, contrary to Defendants' argument that the award should have been based on what Plaintiff could have earned in the future as a driver's helper, a job that Plaintiff held when the accident occurred, and which requires heavy lifting, it was reasonable for the jury to base its award on Plaintiff's future lost earnings in the nursing field, as Plaintiff is unable to continue as a driver's helper, which requires lifting outside of the light to moderate range of physical activity.[4]  Plaintiff will be able to engage in some form of employment, likely as an LPN, a profession for which he is currently studying.  However, it was determined by Plaintiff's vocational expert that Plaintiff will probably have several years when his injuries may prevent him from working at all, or will force him to take employment beneath his highest earning potential.  (Tr., 45:12-16, August 3, 2011).

As discussed above under the standard for remittitur, there exists credible and unrefuted evidence to support the jury award for future lost earnings, making Defendants' argument of excessiveness unfounded.  Thus, the Court declines to recommend remittitur.

## CONCLUSION

Based on the discussion above, the Court finds that Defendants have failed to meet their required burden of proof for a new trial, or in the alternative, remittitur.  Accordingly, Defendants' renewed motion for a new trial, or in the alternative, remittitur is denied.  Lastly, the Court also declines Defendants' request for a new proceeding on the issue of damages for future lost earnings.

An appropriate order follows.

---

[4] Plaintiff's medical expert, Dr. Greene, determined that Plaintiff was able to perform physical tasks within a light to moderate range of difficulty.  (Tr. 13:12-15, August 3, 2011).

23